BILL LOCKYER Attorney General SUSAN DUNCAN LEE Deputy Attorney General.
THE HONORABLE SAM AANESTAD, MEMBER OF THE STATE SENATE, has requested an opinion on the following question:
May Class III gaming be conducted on individual "allotment land" or "trust land" held in the name of individual Indians outside the boundaries of an Indian reservation or on land upon which a tribal government did not exercise governmental power until after 1988?
 CONCLUSION
Class III gaming may be conducted on "allotment land" or "trust land" held in the name of individual Indians outside the boundaries of an Indian reservation or on land upon which a tribal government did not exercise governmental power until after 1988 under limited circumstances.
 ANALYSIS
On October 17, 1988, Congress enacted the Indian Gaming Regulatory Act (25 U.S.C. §§ 2701-2721; "IGRA")[1] to provide a " `comprehensive regulatory framework for gaming activities on Indian lands' which `seeks to balance the interests of tribal governments, the states, and the federal government.' [Citation.]" (Pueblo of Santa Ana v. Kelly (10th Cir. 1997) 104 F.3d 1546, 1548.) Broadly speaking, Congress divided gaming activities into three classes, established the National Indian Gaming Commission ("Commission") to regulate Class II gaming, and authorized compacts between Indian tribes and states for the regulation of Class III gaming.
Class I gaming, which is regulated exclusively by tribes, includes social gaming and traditional gaming played in connection with tribal ceremonies and celebrations. (§ 2703(6).) Class II gaming includes non-banking card games (such as poker), bingo, and — if played at the same location as bingo — other games that are similar to bingo. (§ 2703(7)(A).) Tribes are permitted to conduct Class II gaming when the state in which the tribe is located permits such gaming for any purpose, and the tribe adopts a gaming ordinance approved by the Commission. (§ 2710(b)(1).) Class III gaming includes all forms of gaming that are not Class I or Class II gaming, such as banking card games, slot machines, casino games, and parimutuel betting. (§ 2703(8).) Tribes are permitted to conduct Class III gaming when the state in which the tribe is located permits such gaming for any purpose, the tribe adopts a gaming ordinance approved by the Commission, and the tribe and the state have negotiated a compact approved by the Secretary of the Interior. (§ 2710(d).) (See generally In re Indian Gaming Related Cases (9th Cir. 2003) 331 F.3d 1094, 1096-1097; Seneca-Cayuga Tribe v. National IndianGaming (10th Cir. 2003) 327 F.3d 1019, 1022-1024; Cox, The Indian GamingRegulatory Act: An Overview (1995) 7 St. Thomas L.Rev. 769, 774-775.)
One condition imposed by IGRA is that an Indian tribe may conduct Class III gaming only on "Indian lands within such tribe's jurisdiction." (§ 2710 (b)(1), (d)(1)(A)(ii).)
The question presented for resolution concerns whether certain lands outside the borders of an Indian reservation or over which a tribe did not exercise control until after 1988 may be classified as "Indian lands" within the meaning of IGRA so as to be eligible for Class III gaming. We conclude that the lands in question may be classified as "Indian lands" and Class III gaming may occur on them, but only under limited circumstances.
Preliminarily, we note that for purposes of IGRA, the term "Indian lands" means:
 "(A) all lands within the limits of any Indian reservation; and
 "(B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." (§ 2703(4).)
Regulations issued by the Commission further clarify the definition of "Indian lands" as follows:
 "Indian lands means:
 "(a) Land within the limits of an Indian reservation; or
 "(b) Land over which an Indian tribe exercises governmental power and that is either —
 "(1) Held in trust by the United States for the benefit of any Indian tribe or individual; or
 "(2) Held by an Indian tribe or individual subject to restriction by the United States against alienation." (25 C.F.R. § 502.12 (2006).)
Here, we are asked the status of "individual `allotment land' or `trust land' held in the name of individual Indians." The specific terms in this phrase are not defined in IGRA. However, the terms "individual Indian" and "trust land" are defined for purposes of the federal government acquiring land in trust for individual Indians and tribes. An "individual Indian" is:
 "(1) Any person who is an enrolled member of a tribe;
 "(2) Any person who is a descendant of such a member and said descendant was, on June 1, 1934, physically residing on a federally recognized Indian reservation;
 "(3) Any other person possessing a total of one-half or more degree Indian blood of a tribe;
 ". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ." (25 C.F.R. § 151.2(c) (2006).)
"Trust land" is defined as follows:
 "Trust land or land in trust status means land the title to which is held in trust by the United States for an individual Indian or a tribe." (25 C.F.R. § 121.5(d) (2006).)
Because various provisions of IGRA refer to federal government decisions to acquire land in trust (see, e.g., § 2719), we will apply these related definitions to IGRA in answering the question presented.
With respect to the term "allotment land," we believe that it is functionally indistinguishable from "trust land" for purposes of this opinion. These two terms are often used interchangeably. (See, e.g.,Alaska v. Native Village of Venetie Tribal Government (1998)522 U.S. 520, 527-531.) As one authority has observed:
 "Allotments are subject to federal restraints on encumbrance and alienation, and are exempt from taxation during the restricted period. These restraints apply by operation of law, whether the restrictions appear on the patent or other title document. The restrictions are not personal to the allottee, but generally run with the land to the allottee's Indian heirs or devisees." (Cohen's Handbook of Federal Indian Law (2005) § 16.03[1], p. 1040, fns. omitted.)
Accordingly, the phrase "individual allotment land or trust land held in the name of individual Indians" refers to a parcel of land, title to which is in the name of an individual Indian and not a tribe, and which is either held in trust by the United States for an individual Indian or is subject to restrictions on alienation and encumbrance by operation of law.[2] With these definitions and characteristics in mind, we first consider whether Class III gaming may be conducted on individual trust land or allotment land when such land is outside the borders of an Indian reservation.
The provisions of section 2703(4) and the Commission's clarifying regulation, both quoted above, permit Class III gaming on land outside a reservation and held in the name of an individual Indian if the land is held in trust by the United States or is subject to restriction by the United States against alienation. Since the types of land we are considering here are either held in trust or restricted, they fit within the definition of "Indian lands" upon which Class III gaming may be conducted.
However, the trust or restricted status of an individual Indian's land is not in itself sufficient to permit the land to be classified as "Indian lands" for purposes of Class III gaming. The property must also be land "over which an Indian tribe exercises governmental power." (25 U.S.C. § 2703(4).) This determination is made by the Commission on a case-by-case basis, reviewable by the federal courts. (See, e.g.,Kansas v. U. S. (10th Cir. 2001) 249 F.3d 1213.) Responding to comments regarding its proposed regulations in 1992, the Commission stated:
 "One commenter suggested defining `exercises of governmental power' in the definition of `Indian lands' in proposed § 502.1(b). Another commenter asked if that phrase is synonymous with jurisdiction. The Commission decided not to define this term but rather will make determinations on a case-by-case basis. The Commission intends to consult with the Department of the Interior which has considerable expertise in jurisdictional issues on Indian lands." (57 Fed. Reg. 12382, 12388 (Apr. 9, 1992).)
In State of R.I. v. Naragansett Indian Tribe (1st Cir. 1994)19 F.3d 685, 702-703, the Court of Appeals declared:
 "In addition to having jurisdiction, a tribe must exercise governmental power in order to trigger the Gaming Act. Meeting this requirement does not depend upon the Tribe's theoretical authority, but upon the presence of concrete manifestations of that authority. . . ."
Examples of governmental power include providing housing programs, water regulation, health care, job training, education, and social services. (Id. at p. 703; see also Cheyenne River Sioux Tribe v. State of SouthDakota (D.S.D. 1993) 830 F.Supp. 523, 528, affd. (8th Cir. 1993)3 F.3d 273, 280.)
Hence, neither the form of the land title nor unilateral action by a tribe to assert governmental power is in itself sufficient to establish Class III gaming eligibility on individual "allotment land" or "trust land" held in the name of individual Indians outside the boundaries of an Indian reservation.
With respect to possible Class III gaming in the second set of circumstances presented, land upon which a tribal government did not exercise control until after 1988, we first note IGRA's general prohibition against gaming on any land acquired in trust after October 17, 1988. (§ 2719(a) ["Except as provided in subsection (b), gaming regulated by this Act shall not be conducted on lands acquired by the Secretary [of the Interior] in trust for the benefit of an Indian tribe after the date of enactment of this Act unless . . ."].) This general prohibition, however, is subject to exceptions that include land within or contiguous to a reservation in existence prior to October 17, 1988 (§ 2719(a)), tribes that were without a reservation on October 17, 1988 (§ 2719(a)(2)), land obtained as part of a land claim settlement (§ 2719(b)(1)(B)(i)), land comprising the initial reservation of a tribe acknowledged by the Secretary of the Interior (§ 2719(b)(1)(B)(ii)), and for "the restoration of lands for an Indian tribe that is restored to Federal recognition" (§ 2719(b)(2)(B)(iii)). In addition, gaming may be permitted by the Secretary of the Interior if it would be in the tribe's best interest, not detrimental to the surrounding community, and the governor of the interested state concurs. (§ 2719(b)(1)(A).)
As previously observed, jurisdiction over the land is a prerequisite to a tribal government's exercising governmental power. (See Kansas v.U. S., supra, 249 F.3d at p. 1229.) Section 2719 contemplates that Class III gaming may be permitted in some circumstances on land coming under a tribe's sovereign jurisdiction after 1988. It follows that section 2719 necessarily contemplates that Class III gaming may be permitted in some circumstances on land upon which a tribal government did not exercise governmental power until after 1988.
Thus, in City of Roseville v. Norton (D.C. Cir. 2003) 348 F.3d 1020, for example, the Court of Appeals held that the Auburn Indian Band could conduct Class III gaming on "restoration lands" (§ 2719(b)(1)(B)(iii)) that were not taken into trust until after 1994, which were neither on nor close to the tribe's former reservation, but were within geographical limits prescribed by the statute that restored federal recognition to the tribe. (Id. at pp. 1022-1023.)[3] Other situations may permit Class III gaming on land over which a tribe did not exercise governmental power until after 1988. These determinations are made by the Department of the Interior on a case-by-case basis. (See 25 C.F.R. §§ 151.1-151.15 (2006); 71 Fed. Reg. 58769-58776 (Oct. 5, 2006);Confederated Tribes of Coos v. Babbitt (D.D.C. 2000) 116 F.Supp.2d 155,164-165; Grand Traverse Band of Ottowa Chippewa v. U.S. (W.D.Mich. 1999) 46 F.Supp.2d 689, 700-704, 706-708.)[4]
Accordingly, we conclude that Class III gaming may be conducted on individual "allotment land" or "trust land" held in the name of individual Indians outside the boundaries of an Indian reservation and on land upon which a tribal government did not exercise governmental power until after 1988 under limited circumstances.
[1] All further references to title 25 of the United States Code are by section number only.
[2] "Restricted land or land in restricted status means land the title to which is held by an individual Indian or a tribe and which can only be alienated or encumbered by the owner with the approval of the Secretary [of the Interior] because of limitations contained in the conveyance instrument pursuant to federal law or because of a federal law directly imposing such limitations." (25 C.F.R. § 151.2(e) (2006).)
[3] The court stated that it "has no occasion to decide whether land obtained by a tribe other than through the tribe's restoration act is the `restoration of lands' for IGRA purposes, nor whether `restored' tribes include those whose termination or recognition has not been the result of congressional action." (City of Roseville v. Norton,supra, 348 F.3d at p. 1026.)
[4] The general prohibition against conducting Class III gaming on land acquired after October 17, 1988, cannot be circumvented by the execution of a tribal-state gaming compact. (See 64 Fed. Reg. 17574, 17577 (Apr. 12, 1999); South Dakota v. U.S. Dept. of Interior (8th Cir. 2005) 423 F.3d 790, 803, fn. 11; Keweenaw Bay Indian Community v.U.S. (6th Cir. 1998) 136 F.3d 469, 474-476; Cohen, supra, § 12.04[2], p. 871.)